AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



**LODGED**
CLERK, U.S. DISTRICT COURT

5/10/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT

5/10/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:   DL   DEPUTY

United States of America

v.

MALIK LAMONT POWELL, KHAI MCGHEE
aka "Cameron Smith," and MARQUISE
ANTHONY GARDON,

Defendants

Case No.      2:21-mj-02313-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 4, 2021 in the county of Los Angeles in the Central District of California, the

defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1951(a) | Conspiracy to Commit Hobbs Act Robbery |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Michael Fukuda*
*Complainant's signature*

_____
Michael Fukuda, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:      5/10/2021      _____
Rozella a. Oli
*Judge's signature*

City and state:   Los Angeles, California      Hon. Rozella Oliver, U.S. Magistrate Judge
*Printed name and title*

AUSA: Axelrad x7964

**AFFIDAVIT**

I, Michael Fukuda, being duly sworn, declare and state as follows:

**I.  INTRODUCTION**

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2008.  In September 2008, I completed 21 weeks of training at the FBI Academy in Quantico, Virginia, where I received formal training in criminal investigative tactics, techniques and evidence collection.  I have received training in, and have conducted, investigations of bank robberies and violent crime.  From September 2019 to the present, I have been assigned to the Violent Crimes Squad and worked as a Hobbs Act Robbery and Bank Robbery Investigator in the Los Angeles Division of the FBI.

2.    In connection with the robbery investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data, including cellular tower logs, as well as collecting and processing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, which includes FBI SAs experienced with bank robbery investigations and commercial robbery investigations, I am familiar with the methods used by individuals to commit robberies as well as effective investigative methods to solve them.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.   This affidavit is made in support of a criminal complaint against and arrest warrants for:  Malik Lamont POWELL ("POWELL"), Khai MCGHEE, also known as "Cameron Smith" ("MCGHEE"), and Marquise Anthony GARDON ("GARDON"), for a violation of 18 U.S.C. § 1951(a), Conspiracy to Interfere with Commerce by Robbery (hereafter, the "SUBJECT OFFENSE").

4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.   On March 4, 2021, an armed robbery occurred at the Il Pastaio restaurant in Beverly Hills, California.  During the robbery, a restaurant patron was held at gun point while he was robbed by three men for his Richard Mille wrist watch, worth approximately $500,000.00.  A struggle for the gun ensued, during which approximately two rounds were discharged from the firearm, striking another patron of the restaurant.  Based on a review of video surveillance footage and witness statements, a

total of five individuals are believed to be involved in the
robbery crew that committed this robbery.

5.    Presently, of these five conspirators involved in this
robbery, law enforcement has identified POWELL and MCGHEE as two
of the three robbers who assaulted the victim, and GARDON as an
additional driver of the robbery crew's getaway car.  POWELL,
MCGHEE, and GARDON are all documented members of the Rollin 30's
criminal street gang.

6.    There is probable cause to believe POWELL participated
in the robbery based upon, among other things, the car (namely,
a black BMW) used to transport the robbery crew to and from the
robbery belonged to POWELL, POWELL's cell phone was present near
Il Pastaio at the time of the robbery, social media messages by
POWELL appearing to discuss the stolen watch just hours after
the robbery, images of various guns and high-value wristwatches
contained within his social media accounts, and his presence
hours after the robbery with other unidentified participants in
the robbery.

7.    There is probable cause to believe that MCGHEE
participated in the robbery based upon, among other things, the
presence of his DNA on the clothing of the robbery victim
following the struggle during the robbery, MCGHEE's consistent
body type and physical statute to the three individuals who
assaulted the victim during the robbery, and images of him
contained within POWELL's Instagram accounts.

8.    There is probable cause to believe that GARDON
participated in the robbery based upon, among other things, he

3

appears on surveillance camera footage getting out of the rear
passenger seat and into the driver's seat of POWELL's black BMW
(used to transport the robbery crew) just before the robbery at
Il Pastaio, the presence of his phone near Il Pastaio at the
time of the robbery, and images of him contained within POWELL's
Instagram accounts.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    The March 4, 2021 Robbery**

9.    Based on my training and experience, conversations
with other law enforcement agents and officers, as well as my
personal familiarity with this investigation, I am aware of the
following:

a.    On March 4, 2021, at approximately 2:10 p.m.,
Beverly Hills Police Department ("BHPD") patrol officers
responded to a radio call of a shooting at Il Pastaio
restaurant, located at 400 N. Canon Drive, Beverly Hills,
California.

b.    The victim, S.B., was contacted by BHPD and
explained that as he was seated outside Il Pastaio in the
outdoor dining area along Canon Drive when the robbery occurred.
Victim S.B. observed three Black males with hoods pulled over
their heads approach him at his table.  The first robber pointed
a handgun at victim S.B.'s head and said, "Give it to me."  As
the first robber held victim S.B. at gunpoint, the second and

third robbers forcefully removed victim S.B.'s watch from his
wrist.[1]

      c.   While the three robbers and victim S.B. were
struggling, victim S.B. grabbed the handgun which was being held
against his temple by the first robber and began to fight with
him for control of the weapon.  During the course of the
struggle, the third robber appears to have picked up the gun
after which approximately 2 rounds were discharged in various
directions in the crowded restaurant.  One Il Pastaio diner was
shot in the leg.  Ultimately, the handgun was dropped to the
ground during the struggle with victim S.B.  The second robber
can be seen picking up the victim's watch.  All three robbers
fled the scene with victim S.B.'s watch.  The handgun, a Glock
19 Generation 5, 9mm caliber, bearing serial number BRZC854, was
left at the scene and recovered by law enforcement.

      d.   Victim S.B. described his stolen watch as a
Richard Mille-RM-11-03 Rose Gold Flyback worth approximately
$500,000.00

**B.    Robbery Crew Scouts Beverly Hills Before Il Pastaio
Robbery**

   10.  Based on my training and experience, conversations
with other law enforcement agents and officers, as well as my
personal familiarity with this investigation, I am aware of the
following:

---

[1]  These three individuals who assaulted and robbed victim
S.B. are referred to throughout as the first, second, and third
robbers.

a.    Following the robbery, law enforcement obtained surveillance camera footage from numerous locations surrounding the Il Pastaio restaurant and throughout the greater Beverly Hills area.  As described below, the suspect vehicle used in the robbery was a black BMW 328i GT (as discussed below, this BMW is registered to POWELL.)

b.    Specifically, as seen on surveillance camera footage, law enforcement observed the black BMW enter Beverly Hills at approximately 1:01 p.m., after which it began to drive around the Beverly Hills business district where Il Pastaio is located.  At approximately 1:09 p.m., an Automated License Plate Reader camera captured the BMW driving south on Rodeo Drive.

c.    As seen on the surveillance camera footage, inside the BMW, a woman wearing a dark colored top with white writing on the chest and white stripes down the left sleeve appeared to be sitting in the front passenger seat (hereafter, the "female scout.")

d.    At approximately 1:26 p.m., the female scout got out of the BMW on Rodeo Drive.  She then proceeded to walk up the "2 Rodeo" shopping area with her sweatshirt hood pulled up and face mask on, while appearing to speak on her cell phone. The 2 Rodeo shopping area houses several high-end watch and jewelry stores.

e.    At approximately 1:35 p.m., the female scout began walking around the stores near 2 Rodeo, appearing to scout potential targets for a robbery, while also appearing to remain

on the phone.  The female scout eventually got back into the
front seat of the BMW.

f.   The BMW then continued on Rodeo Drive to Dayton
Way where the female scout once again got out of the BMW.  The
female scout walked through the outdoor-eating area of a
restaurant on the corner of Beverly Drive and Dayton Way while
again appearing to talk on her cell phone, before she turned
around and walked back through the same outdoor eating area and
eventually got back into the BMW.

g.   At approximately 1:49 p.m., the BMW stopped near
the alley between Crescent Drive and Canon Drive, where the
first robber, wearing a blue hooded sweatshirt and light-colored
pants, got out of the driver's seat of the BMW.

h.   A fifth individual, a heavy-set male subsequently
identified as GARDON, then got out of the BMW's rear passenger
door and into the BMW's driver's seat.  Shortly thereafter, the
first robber walked out of the alley towards Canon Drive where
he turned to go south.

i.   As captured on surveillance camera, the first
robber then proceeded to walk through several outdoor restaurant
seating areas, including Il Pastaio.  The BMW then reappeared on
surveillance camera footage and drove south on Canon Drive past
the first robber before pulling into the Rite-Aid located at 300
N. Canon Drive, before making a U-turn and heading back towards
the first robber.

j.   At approximately 2:05 p.m., the BMW arrived in
the alley south of 360 N. Crescent Drive, Beverly Hills, and out

of view of current surveillance camera footage.  This location
is approximately 200 yards from Il Pastaio.  From the BMW's
location in the alley, the first, second, and third robbers can
be seen walking in the direction of Il Pastaio.[2]  The robbery at
Il Pastaio of victim S.B. occurred at approximately 2:09 p.m.

        k.   Following the robbery, at approximately 2:11
p.m., surveillance cameras capture the first, second, and third
robbers running back to the alley where the BMW was parked.  The
first, second, and third robbers were wearing the same clothing
as depicted in the surveillance camera footage of the robbery.

        l.   At approximately 2:11 p.m., as seen on
surveillance camera footage, the BMW drove out of Beverly Hills.

**C.   Identification of POWELL's BMW as the Car Used to
Scout the Robbery and Transport the Robbery Crew**

        12.  Based on my training and experience, conversations
with other law enforcement agents and officers, as well as my
personal familiarity with this investigation, I am aware of the
following:

        a.   On March 7, 2021, based on a review of
surveillance camera footage, law enforcement determined that the
black BMW used to transport the robbery crew to Beverly Hills to
commit the robbery had temporary California license plate
AU22G43.  A California Department of Motor Vehicles records
check of license plate AU22G43 returns to a black 2015 BMW 328i

---

[2] At this point, the BMW had driven just out of view of the
nearby surveillance camera and presently there is no known
recording of the first, second, and third robbers getting out of
the BMW.

GT, registered to "Malik Powell" at 3971 2nd Ave, Los Angeles, California 90008 (hereafter, "POWELL's BMW.")

**D.    Identification of POWELL, MCGHEE, and GARDON**

13.    Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.    Los Angeles Police Department Officer Chad Scott, who has had multiple prior contacts with POWELL and the Rollin 30's, has reviewed surveillance video and stills of the first robber.  Officer Scott, who is assigned to the Southwest Division Gang Unit, and whose primary assignment is to monitor and investigate the criminal activities committed by the Rollin 30's, is well-acquainted with POWELL's appearance, associates, and social media accounts.

b.    On March 9, 2021, I queried law enforcement databases and determined that POWELL has the following criminal history: a July 2019 felony conviction for Criminal Threats, in violation of California Penal Code section 422; and an August 2020 arrest for Robbery, in violation of Nevada statute 200.380; and an October 2020 arrest for Possession of a Firearm by a Prohibited person, in violation of California Penal Code section 29800(a)(1).

c.    Based on my conversations with other law enforcement officers, POWELL is a documented Rollin 30's Harlem Crips gang member.  Indeed, on or around February 6, 2021, law enforcement conducted a traffic stop of a Hyundai driven by

GARDON, and occupied by POWELL, MCGHEE, and Errol Jones.  On or around February 13, 2021, law enforcement conducted a traffic stop of POWELL's BMW.  POWELL was the driver of the BMW, with MCGHEE and Errol Jones in the car as well.

14.  Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.  Following the robbery, victim S.B.'s shirt was collected due to the presence of blood stains on the front and back of the victim's shirt.  The blood stains were swabbed for DNA evidence and submitted to Verdugo Regional Crime Lab for testing.

b.  On March 25, 2021, DNA evidence obtained from the blood stain on the victim's shirt was matched to MCGHEE.

c.  On April 29, 2021, Officer Scott viewed a booking photo of MCGHEE taken on April 12, 2019.  Officer Scott immediately recognized MCGHEE as a Rollin 30's gang member and associate of POWELL.  Officer Scott knew MCGHEE as "Cameron Smith," as this is the name MCGHEE provided during previous interactions with Officer Scott.  For example, on February 13, 2021, during the above-mentioned traffic stop of POWELL's BMW, during which POWELL was the driver and accompanied by MCGHEE and Errol Jones, MCGHEE provided the name "Cameron Smith."  Also, on February 6, 2021, Officer Scott conducted a traffic stop of a Hyundai driven by GARDON, and occupied by POWELL, MCGHEE, and

Errol Jones.  During the traffic stop, MCGHEE also provided the name "Cameron Smith."

          d.    On March 30, 2021, I queried law enforcement databases and determined that MCGHEE has the following criminal history:  a December 2018 arrest for Robbery, in violation of Penal Code section 211; a December 2019 arrest for Robbery, in violation of Penal Code section 211; a July 2020 conviction for Assault, in violation of Penal Code section 245(A)(4); and a July 2020 conviction for Grand Theft, in violation of Penal Code section 487(A).

     15.  Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

          a.    As described above, surveillance camera footage from around the time of the robbery, and near Il Pastaio, shows that at approximately 1:49 p.m., the POWELL's BMW stopped in the alley between Crescent Drive and Canon Drive, where POWELL gets out of the driver's seat of the BMW and a heavy-set male gets out of the BMW's rear passenger door and into the driver's seat.

          b.    Based on a review of the surveillance camera footage, as well as his familiarity with GARDON and his distinctive physical stature, LAPD Officer Scott identified this individual as GARDON.

          c.    On March 9, 2021, I queried law enforcement databases and determined that GARDON has the following criminal history: an April 2016 conviction for Battery, in violation of

Penal Code section 242; a May 2016 arrest for Domestic Violence
by strangulation, in violation of Nevada Statute NRS 200.485.2;
and a May 2018 arrest for Battery, in violation of Penal Code
section 242.

    **E.   Identification of POWELL and GARDON's Phone Numbers**

16.   Based on my training and experience, conversations
with other law enforcement agents and officers, as well as my
personal familiarity with this investigation, I am aware of the
following:

    a.   On March 6, 2021, LAPD officers located POWELL's
BMW parked in the vicinity of Vermont Avenue and Francis Avenue
in Los Angeles.  At the time it was located, POWELL's BMW was
occupied by five individuals.  The BMW was towed to the Beverly
Hills Police Department and held as evidence.

    b.   On March 8, 2021, law enforcement obtained a
state search warrant for POWELL's BMW.  During a search of
POWELL's BMW, a Jiffy Lube service contract dated March 3, 2021
was recovered from the glove compartment.  The contact phone
number for POWELL listed on the Jiffy Lube service contract was
323-215-9835 (hereafter, "POWELL's Phone").

    c.   On or around April 26, 2021, I queried law
enforcement databases for POWELL's Phone and located the number
on a November 4, 2020 insurance claim filed by POWELL's for
another vehicle.

    d.   Also recovered during the search of POWELL's BMW
was a Hyundai service receipt dated November 25, 2020.  This

receipt had GARDON's name on it and phone number 323-635-6321 (hereafter, "GARDON's Phone").

e.   On or around April 26, 2021, I queried law enforcement databases for GARDON's Phone and found the number listed on an insurance claim dated February 16, 2021 as the contact phone number for GARDON.

**F.   Cell Site Data Places POWELL and GARDON's Phones Phone Near Il Pastaio at the Time of the Robbery**

17.   Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.   On March 16, 2021, law enforcement obtained search warrants seeking call detail records, cell site location data, and GPS Precision location information for POWELL's Phone and GARDON's Phone.

b.   An analysis of the historical cell site data for POWELL's Phone shows the following activity on March 4, 2021:

i.   At approximately 1:17 p.m., POWELL's Phone placed and received a call using a cell tower located at 414 N. Camden Drive, Beverly Hills – approximately .3 miles from Il Pastaio.  At approximately 1:27 p.m., POWELL's Phone received a call from phone number 323-635-6321, using this same tower on Camden Drive.[3]

_____

[3]  As discussed below, the number 323-635-6321 is believed to belong to GARDON.  At the time this call was made, law enforcement believes that POWELL and GARDON were located in POWELL's BMW together and that GARDON's phone may have been used by the female scout to communicate with those in POWELL's BMW.

ii.  At approximately 2:10 p.m., POWELL's Phone received a call using a cell tower located at 9350 Wilshire Boulevard, Beverly Hills – approximately .4 miles from Il Pastaio.  The robbery occurred at approximately 2:09 p.m. Immediately following the robbery, at approximately 2:12 p.m., POWELL's Phone received a call using the same cell tower just .4 miles from Il Pastaio.

iii. After the robbery, from 2:18 p.m. through 2:37 p.m., on three separate occasions, POWELL's Phone utilized cell towers that indicate the phone was traveling eastbound towards downtown Los Angeles.  By approximately 2:50 p.m., cell site activity shows POWELL's Phone in the downtown Los Angeles area, where it remains until approximately 7:00 p.m.  As discussed below, this is near the location of a possible buyer of the stolen Richard Millie wristwatch.

iv.  At approximately 10:21 p.m., POWELL's Phone utilized a cell tower located in the vicinity of 9750 Airport Boulevard, Los Angeles, within 300 feet of the Renaissance Los Angeles Airport Hotel.

c.  Analysis of historical cell site data for GARDON's Phone shows the following activity on March 4, 2021:

i.  At approximately 1:27 p.m., GARDON's Phone received a call from POWELL's Phone using a cell tower located approximately .3 miles from Il Pastaio.

ii.  At approximately 2:28 p.m., GARDON's Phone placed a call using a cell tower located at 1625 Crenshaw Boulevard, Los Angeles, CA.

14

iii. At approximately 2:46 p.m., GARDON's Phone received a call while using a cell tower located at 1601 Los Angeles Street in downtown Los Angeles. As discussed below, this is approximately 2.7 miles from the location of a possible buyer of the stolen Richard Millie wristwatch.

**G.    POWELL's Post-Robbery Meetup at the Renaissance Hotel with the Female Scout from the Il Pastaio Robbery**

18.    Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.    On March 18, 2021, law enforcement obtained a state search warrant for all stored electronic data in POWELL's BMW's Infotainment System and/or Telematics System and related digital storage media.

b.    On March 18, 2021, while attempting to access POWELL's BMW's electronic data from inside the car, I observed a parking receipt in plain view in the interior of the car. The parking receipt is from the Renaissance Los Angeles Airport Hotel and was time stamped for March 4, 2021 at 10:13 p.m. Additionally, also in plain view, was a Marriott Bonvoy key card envelope for room number 243.

c.    On March 19, 2021, I served the Renaissance Los Angeles Airport Hotel with a federal subpoena for information related to hotel room 243, as well as all available security camera footage.

d.   On March 19, 2021, while monitoring archived surveillance camera footage at the Renaissance Hotel, I observed the following:

i.   On March 4, 2021, at approximately 10:12 p.m., a sedan drove into the RENAISSANCE Hotel parking garage. The sedan (hereafter, "Vehicle 1") stopped momentarily at the driveway of the parking garage and appeared to be issued an automated ticket.  Vehicle 1 appeared to be driven by a woman. As seen on the surveillance camera footage, Vehicle 1 was immediately followed by a second car that resembles POWELL's BMW, which also appeared to receive an automated ticket and drive into the parking garage.

ii.   At approximately 10:19 p.m., inside the Renaissance Hotel, three hooded individuals entered a hotel elevator that takes guests from the garage to the hotel lobby. One of the individuals, while waiting for the elevator to arrive, removed his hooded sweatshirt.  Officer Chad Scott has reviewed this video and identified this individual as POWELL.

iii. One of the other individuals appeared to be a woman and who wore the same distinctive clothing as the female scout from the robbery earlier that day, i.e. hooded sweatshirt with the distinctive multi-colored design on the back of the sweatshirt and sleeve, same sandals, and same headpiece protruded from under the hood of her sweatshirt.  Based on the identical clothing and similar build, I believe this individual with POWELL at the Renaissance Hotel was the female scout.

**H.   POWELL Arrested by Riverside Police Department Near the Arlington Inn in Riverside, California**

19.  Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.   On March 18, 2021, POWELL was arrested for an outstanding state warrant by the Riverside Police Department ("RPD") in the vicinity of the Arlington Inn located at 6843 Arlington Avenue, Riverside CA.  A cellphone was recovered from POWELL's person at the time of his arrest.

b.   On March 18, 2021, POWELL was transported to the Beverly Hills Police Department where he was booked for Robbery, in violation of California Penal Code 211, and Assault with a Deadly Weapon, in violation of Penal Code 245(A)(1).

**I.   POWELL's Cell Phone is Searched and Found to Contain an Image of a Richard Mille Wrist Watch that Appears Identical to the Watch Stolen During the Il Pastaio Robbery on March 4, 2021**

20.  Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.   On March 19, 2021, law enforcement obtained a state search warrant for the cell phone recovered from POWELL on March 18, 2021, at the time of his arrest in Riverside, CA. During a search of the contents of the cell phone, a photo was found depicting a close-up of a Richard Mille wristwatch.  The photo was taken on March 12, 2021.

17

b.   The watch in the photo, including the distinctive red band, appears to be identical to the Richard Mille-RM-11-03 Rose Gold Flyback that was stolen during the March 4, 2021 robbery at the Il Pastaio in Beverly Hills.[4]

**J.   POWELL's Instagram Accounts Contain Conversations Related to the Stolen Wristwatch and Images of MCGHEE, GARDON, Firearms, Cash, and High-End Wristwatches**

21.   Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.   On March 15, 2021, the Honorable Jean P. Rosenbluth, United States Magistrate Judge, issued a warrant authorizing the search of two Instagram accounts believed to be owned and used by POWELL.  See 21-MJ-01258.[5]  Specifically, the first account used an Instagram display name of "ohbkoy5k" and Instagram name "OriginalHarlemBkoy" (hereafter, "ohbkoy5k") and the second account used an Instagram display name of "ohbkoy5" and Instagram name "OriginalHarlemBkoy" (hereafter, "ohbkoy5".)

b.   During a review of the ohbkoy5 account, law enforcement discovered the following:

---

[4]   The phone recovered from POWELL on March 18, 2021, in Riverside, California did not correspond to 323-215-9835, that is, it was not the same number used during the Il Pastaio robbery.  Based on my training and experience, I am familiar with robbery suspects changing phones or switching numbers following a robbery.  This is particularly true where a robbery, as was the case here, was the subject of media attention.

[5]   A copy of the warrant is attached hereto as Exhibit 1 and incorporated by reference fully herein.

   i. On March 4, 2021, at approximately 2:14 p.m., ohbkoy5 started a video call with Instagram account "dmbswerv."  The video ended at 2:15 p.m.  At 7:29 p.m., "dmbswerv" messaged ohbkoy5 and stated "That's The Richard Mille."  This message was followed immediately by a video call between "dmbswerv" and ohbkoy5.

   ii. On March 4, 2021, at approximately 2:24 p.m., ohbkoy5 started a video call with Instagram account "hotbkoykaykay."  The video ended at 2:25 p.m.  At 2:26 p.m., "hotbkoykaykay" sent a photo to ohbkoy5 that was a screen shot of an Instagram profile page with the Instagram name "JAMES V TA."  The profile page included profile details, that stated, among other things, "Jewelry & Watches Store," "Chinatown based," "Not your average Jeweler," "818 N. Broadway, Suite 212, Los Angeles, California."[6]

   iii. At 2:27 p.m., "hotbkoykaykay" sent a message to ohbkoy5 that stated, "I'm calling him right now." Approximately 14 seconds later, "hotbkoykaykay" sent a message to ohbkoy5 that stated, "Go to the address he gone checC it and

---

[6] From approximately 2:50 p.m., cell site activity shows POWELL's Phone in the downtown Los Angeles area, where it remains until approximately 7:00 p.m.  At approximately 4:57 p.m., POWELL's phone received an incoming call using a cell tower located at 727 North Broadway, Los Angeles.  This cell tower is less than a quarter mile from the jewelry and watch store associated with "James V Ta" located at 818 N. Broadway, Suite 212, Los Angeles.  Similarly, at approximately 3:46 p.m., GARDON's Phone received an incoming call using a cell tower located at 1601 Los Angeles Street, Los Angeles.  At 3:47 p.m., GARDON's Phone made an outgoing call using the same tower located at 1601 Los Angeles Street, Los Angeles.  This cell tower is approximately 2.7 miles from the jewelry and watch store associated with "James V Ta" located at 818 N. Broadway, Suite 212, Los Angeles.

make sure it's real."  This message was followed by a video call at 2:28 p.m. and again at 2:31 p.m. between "hotbkoykaykay" and ohbkoy5.

       iv.  At 3:09 p.m., "hotbkoykaykay" sent a message to ohbkoy5 that asked, "How far."  ohbkoy5 replied "5 mins."  At 3:27 p.m., "hotbkoykaykay" asked, "You there yet," followed by two video calls.

       v.  From 4:54 p.m. to 5:31 p.m., ohbkoy5 and "hotbkoykaykay" exchanged a series of messages, as follows:

- hotbkoykaykay:  "I'm about to call my other bkoy"

- ohbkoy5:  "I'm dirt"

- hotbkoykaykay:  "Cuh said stay low it's all over the news"

- hotbkoykaykay:  "I'm about to call my other bkoy right now don't tell nobody about it"

- hotbkoykaykay:  "I just seen it on the news"

- ohbkoy5:  "You trynna keep 50 deadhomies thas out I'm dirt"

- hotbkoykaykay:  "My nigga about give you 100 right now"

- hotbkoykaykay:  "I just called him"

- ohbkoy5:  "I can get 140 I'm dirt"

- ohbkoy5:  "If he was giving you 50 & me 90 u add that up"

- hotbkoykaykay:  "He cap he don't want it unless he win"

- hotbkoykaykay:  "He said it will sit with him to long"

- hotbkoykaykay:  "You want 150 or no?"

- ohbkoy5:  "Yeah"

- hotbkoykaykay:  "He said send pic"

- hotbkoykaykay:  "just the face"

c.   Based on my training and experience, as well as my familiarity with this investigation, I believe the above-referenced conversation between POWELL, using his Instagram account ohbkoy5, and "hotbkoykaykay," relates to POWELL's attempts to immediately sell the stolen Richard Millie wristwatch, the price that could be obtained for the stolen watch, and the media publicity the daytime robbery and shooting hard already generated by this time.

d.   A review of both of POWELL's accounts also revealed numerous images of firearms (including handguns similar that used during the Il Pastaio robbery), cash, and high-value wristwatches, including Richard Millie – the same make of wristwatch stolen from victim S.B. on March 4, 2021.  Both GARDON and MCGHEE are also present in several images found in POWELL's Instagram accounts.

**K.   Robbery of Victim S.B. at Il Pastaio Affected Interstate Commerce**

22.  Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.   Law enforcement responded to the scene of the Il Pastaio robbery on March 4, 2021.  Il Pastaio is located within a high-traffic area of Beverly Hills that is predominated by commercial businesses.  As a result of the significant law enforcement presence and investigation following the robbery, Il Pastaio was shut down and remained closed for the remainder of

21

the day and the streets surrounding Il Pastio were similarly blocked off for several hours.[7]

        b.    Based on my conversations with other law enforcement officers, I understand that victim S.B. filed an insurance claim for the full value of the Richard Mille-RM-11-03 Rose Gold Flyback stolen on March 4, 2021.

//

//

---

[7] "To establish the interstate commerce element of a Hobbs Act charge, the government need only establish that a defendant's acts had a *de minimis* effect on interstate commerce." United States v. Lynch, 437 F.3d 902, 908-09 (9th Cir. 2006) (emphasis added). The interruption of a business engaged in interstate commerce is sufficient. United States v. Fierro, 450 F. App'x 586, 588 (9th Cir. 2011) (finding police investigation following robbery of the business, and the resulting interruption in the business, was sufficient to prove interstate commerce). Robbery of a single individual for a very large sum can directly affect interstate commerce. See United States v. Wang, 222 F.3d 234, 239 (6th Cir. 2000) ("The federal courts have acknowledged, for example, that victimization of a large number of individuals, or victimization of a single individual for a very large sum, can have the potential directly to affect interstate commerce.")

## V.  <u>CONCLUSION</u>

23.  For all of the reasons described above, there is probable cause to believe that POWELL, MCGHEE, and GARDON committed the SUBJECT OFFENSE.

/S/

_____
Michael Fukuda, Special Agent
Federal Bureau of
Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this __10__th day of May, 2021.

*Rozella A. Oli*

_____
UNITED STATES MAGISTRATE JUDGE

Hon. Rozella A. Oliver

23

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of:<br>Information associated with accounts identified as<br>ohbkoy5k and ohbkoy5 that are within the<br>possession, custody, or control of Facebook, Inc. | )<br>)<br>)<br>)<br>)<br>) |

Case No. 2:21-MJ-01258-AMENDED

## APPLICATION FOR WARRANT PURSUANT TO 18 U.S.C. § 2703

I, a federal law enforcement officer, request a warrant pursuant to Title 18, United States Code, Section 2703, and state under penalty of perjury that I have reason to believe that within the following data:

*See Attachment A*

There are now concealed or contained the items described below:

*See Attachment B*

The basis for the search is:

☑ Evidence of a crime;

☑ Contraband, fruits of crime, or other items illegally possessed;

☐ Property designed for use, intended for use, or used in committing a crime.

The search is related to a violation of:

| Code sections | Offense Description |
|---|---|
| 18 U.S.C. § 1951(a) | Interference Of Commerce By Robbery and Conspiracy To Interfere With Commerce By Robbery |
| 18 U.S.C. § 924(c) | Brandishing and Discharging a Firearm In Furtherance Of a Crime Of Violence |

The application is based on these facts:

*See attached Affidavit, which is incorporated herein by reference.*

Michael Fukuda Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 15, 2021

*Judge's signature*

City and State: Los Angeles, CA

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: J. Axelrad (x7964)

I, Michael Fukuda, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2008.  In September 2008, I completed 21 weeks of training at the FBI Academy in Quantico, Virginia, where I received formal training in criminal investigative tactics, techniques and evidence collection.  I have received training in, and have conducted, investigations of bank robberies and violent crime.  From September 2019 to the present, I have been assigned to the Violent Crimes Squad and worked as a Hobbs Act Robbery and Bank Robbery Investigator in the Los Angeles Division of the FBI.

2.   In connection with the robbery investigations in which I have participated, I have used a variety of investigative techniques, including witness interviews, speaking with law enforcement agents and officers, reviewing surveillance images and cellular telephone data, including cellular tower logs, as well as collecting and processing physical evidence.  As a result of this experience and my conversations with other law enforcement personnel, which includes FBI SAs experienced with bank robbery investigations and commercial robbery investigations, I am familiar with the methods used by individuals to commit robberies as well as effective investigative methods to solve them.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

3.  I make this affidavit in support of an application for a warrant for information associated with the Instagram accounts identified as: "ohbkoy5k" with user ID 30871860702 and Instagram name "OriginalHarlemBkoy" ("SUBJECT ACCOUNT 1"); and "ohbkoy5" with user ID 261180906 and Instagram name "OriginalHarlemBkoy" ("SUBJECT ACCOUNT 2") (collectively, the "SUBJECT ACCOUNTS"), that are stored at premises controlled by Facebook (the "PROVIDER" or "Facebook"), a provider of electronic communication and remote computing services, headquartered at 1601 Willow Road, Menlo Park, California 94025.[1]  The information to be searched is described in Attachment A.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[2] to require the PROVIDER to disclose to the government

---

[1] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A). See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[2] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not
*(footnote cont'd on next page)*

2

copies of the information (including the content of
communications) described in Section II of Attachment B.  Upon
receipt of the information described in Section II of Attachment
B, law enforcement agents and/or individuals assisting law
enforcement and acting at their direction will review that
information to locate the items described in Section III of
Attachment B.  Attachments A and B are incorporated herein by
reference.

    4.    As described more fully below, I respectfully submit
there is probable cause to believe that the information
associated with the SUBJECT ACCOUNTS constitutes evidence,
contraband, fruits, or instrumentalities of criminal violations
of interference of commerce by robbery and conspiracy to
interfere with commerce by robbery, in violation of 18 U.S.C.
§ 1951(a), and brandishing and discharging a firearm in
furtherance of a crime of violence, in violation of 18 U.S.C.
§ 924(c) (collectively, the "SUBJECT OFFENSES").

    5.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from other agents and witnesses.  This

---

content--pertaining to subscribers of an electronic
communications service or remote computing service, the
government must comply with the dictates of section
2703(c)(1)(B), which requires the government to supply specific
and articulable facts showing that there are reasonable grounds
to believe that the records or other information sought are
relevant and material to an ongoing criminal investigation in
order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The
requested warrant calls for both records containing content (see
Attachment B paragraph II.10.a.) as well as subscriber records
and other records and information that do not contain content
(see Attachment B paragraph II.10.b.).

affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

6.    Other than what has been described herein, to my knowledge the United States has not attempted to obtain the contents of the SUBJECT ACCOUNTS by other means.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

7.    On March 4, 2021, an armed robbery occurred at the Il Pastaio restaurant in Beverly Hills, California.  During the course of the robbery, a restaurant patron was held at gun point while his high-value watch was taken by robbers.  A struggle for the gun ensued, during which approximately four rounds were discharged from the firearm, striking another patron of the restaurant.  Based on a review of video surveillance footage and witness statements, a total of five individuals are believed to be involved in this robbery.

8.    During a review of the extensive video surveillance camera footage available from the scene of the robbery and surrounding areas, law enforcement was able to identify the car used by the robbers as a black BMW.  Surveillance camera footage shows the BMW appearing to case various targets around Beverly Hills before settling on the victim at Il Pastaio.  The BMW is currently registered to MALIK POWELL ("POWELL").

9.    POWELL is a documented member of the Rollin 30's
criminal street gang, with a 2019 felony conviction for Criminal
Threats.  Based on open source reporting, POWELL is the user of
the SUBJECT ACCOUNTS.  Indeed, the publicly available portion of
SUBJECT ACCOUNT 2 contains videos of POWELL in possession of
firearms, prescription medications, flashing large quantities of
cash, and close-up shots of high-value watches.

## IV.  STATEMENT OF PROBABLE CAUSE

### A.    The March 4, 2021 Robbery

10.  Based on my training and experience, conversations
with other law enforcement agents and officers, as well as my
personal familiarity with this investigation, I am aware of the
following:

a.    On March 4, 2021, at approximately 2:10 p.m.,
Beverly Hills Police Department ("BHPD") patrol officers
responded to a radio call of a shooting at Il Pastaio
restaurant, located at 400 N. Canon Drive, Beverly Hills,
California.

b.    The victim, S.B., was contacted by BHPD and
explained that he was seated outside Il Pastaio in the outdoor
dining area along Canon Drive when the robbery occurred.  Victim
S.B. observed three Black males with hoods pulled over their
heads approach him at his table.  The first robber pointed his
handgun at victim S.B.'s head and said "Give it to me."  As the
first robber held victim S.B. at gunpoint, the second and third
robbers forcefully removed victim S.B.'s watch from his wrist.

c.    While the three robbers and victim S.B. were struggling, victim S.B. grabbed the handgun which was being held against his temple by the first robber and began to fight with him for control of the weapon.  During the course of the struggled that ensured, the first robber appears to have fired approximately 4 shots in various directions in the crowded restaurant.  One unrelated patron was shot in the leg. Ultimately, victim S.B. was able to remove the handgun from the first robber.  All three robbers fled the scene with victim S.B.'s watch.  The handgun was left at the scene and recovered by law enforcement.

d.    Victim S.B. described his stolen watch as a Richard Mille-RM-11-03 Rose Gold Flyback worth approximately $500,000.

**B.    Identification of MALIK POWELL's BMW**

11.  Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.    On March 7, 2021, law enforcement reviewed surveillance camera footage in order to identify the suspect vehicle which was used during in the robbery.  Based on surveillance camera footage from around the time of the crime and near Il Pastaio, law enforcement determined that the robbers used a black BMW 328i GT, with a temporary California license plate AU22G43 (hereafter, the "BMW").

b.   As seen on surveillance camera footage, law enforcement further observed:

i.   The BMW entered Beverly Hills at approximately 1:01 p.m. traveling east on Wilshire Blvd at Whittier Drive.  From there, the BMW continued to Rodeo Drive and drove around the business district.  At approximately 1:09 p.m., an Automated License Plate Reader camera captured the BMW driving south on Rodeo Drive.

ii.  Inside the BMW, the front seat passenger appeared to be woman wearing a dark colored top with white writing on the chest and white stripes down left sleeve.  This clothing matched the description of a "look out" suspect seen at the location of the robbery.

iii. At approximately 1:26 p.m., the woman ("fourth robber") got out of the BMW on Rodeo Drive just north of Dayton Way.  The fourth robber then proceeded to walk up the "2 Rodeo" shopping area with her sweatshirt hood pulled up and face mask on, while appearing to be communicating with someone on her cell phone.  The 2 Rodeo shopping area houses several high-end watch and jewelry stores.

iv.  Beginning at approximately 1:35 p.m., the fourth robber began walking around the stores near 2 Rodeo, appearing to scout potential targets for a robbery, while appearing to stay on the phone.  The fourth robber eventually got back into the front seat of the BMW.

v.   The BMW then continued on Rodeo Drive to Dayton Way where the fourth robber once again got out of the

BMW. The fourth robber walked through the outdoor eating area of a restaurant on the corner of Beverly Drive and Dayton Way while again appearing to talk on her cell phone, before she turned around and walked back through the same outdoor eating area and eventually got back into the BMW. The BMW then drove north on Canon Drive.

c. At approximately 1:49 p.m., the BMW stopped near the alley between Crescent Drive and Canon Drive, where the second robber, wearing a blue hooded sweatshirt and light colored pants, got out of the driver's seat of the BMW. The fifth robber, a heavy-set male, got out of the BMW's rear passenger door and got into the driver's seat. Shortly thereafter, the second robber walked out of the alley towards Canon Drive where he turned to go south.

d. The second robber then proceeded to walk through several outdoor restaurant seating areas, including Il Pastaio. The BMW then reappears on surveillance camera footage and drives south on Canon Drive past the second robber before pulling into the Rite-Aid located at 300 N Canon Drive. The BMW then made a U-turn and headed towards the second robber.

e. At approximately 2:05 p.m., the BMW arrived in the Crescent Drive/Rexford Drive alley, south of 360 N. Crescent Drive, Beverly Hills, and out of view of current surveillance camera footage. From there, the first, second, and third robbers can be seen walking in the direction of Canon Drive and

Il Pastaio.[3]  The robbery at Il Pastaio of victim S.B. occurred
at approximately 2:09 p.m.  At approximately 2:11 p.m.,
surveillance cameras capture the first, second, and third
robbers running back to the alley where the BMW was parked.  The
first, second, and third robbers were wearing the same clothing
as depicted in the surveillance camera footage of the robbery.

f.    At approximately 2:11 p.m., the BMW drove south
on Rexford Drive from Clifton Way.  The BMW then drove
southbound towards Wilshire Blvd. and made an eastbound turn
where the BMW's license plate can be seen on surveillance camera
footage.

**C.    Identification of MALIK POWELL**

12.  Based on my training and experience, conversations
with other law enforcement agents and officers, as well as my
personal familiarity with this investigation, I am aware of the
following:

a.    A DMV record check of California temporary
license plate number AU22G43, returned to a black 2015 BMW 328,
registered to MALIK POWELL ("POWELL"), 3971 2nd Ave, Los
Angeles, California 90008.

b.    Based on my conversations with other law
enforcement officers, POWELL is a documented Rollin 30's Harlem
Crips gang member.  Indeed, on or around February 11, 2021, law
enforcement conducted two traffic stops of the BMW.  During both

---

[3] At this point, the BMW had driven just out of view of the
nearby surveillance camera and presently there is no known
recording of the first, second, and third robbers getting out of
the BMW.

traffic stops, POWELL was the driver of the BMW. Furthermore, Los Angeles Police Department Officer Chad Scott, who has had multiple prior contacts with POWELL and the Rollin 30's, has reviewed surveillance video and stills of the second robber. Officer Scott, who is assigned to the Southwest Division Gang Unit, and whose primary assignment is to monitor and investigate the criminal activities committed by the Rollin 30's, is well-acquainted with POWELL's appearance, associates, and social media accounts. Based on his personal interactions with POWELL and the Rollin 30's, Officer Scott believes that the second robber depicted in surveillance videos and photos is consistent with POWELL.

c. On March 9, 2021, I queried law enforcement databases and determined that POWELL has the following criminal history:

i. a July 2019 felony conviction for Criminal Threats, in violation of California Penal Code section 422;

ii. an August 2020 arrest for Robbery, in violation of Nevada statute 200.380; and

iii. an October 2020 arrest for Possession of a Firearm by a Prohibited person, in violation of Penal Code section 29800(a)(1).

**D. Identification of the SUBJECT ACCOUNTS**

13. Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.   SUBJECT ACCOUNT 1 is a private account with the Instagram account name "OriginalHarlemBkoy."[4]   SUBJECT ACCOUNT 1 has a publicly available profile page.   Based on my review of the publicly available profile photograph on SUBJECT ACCOUNT 1, the profile photograph depicts an individual I believe to be POWELL wearing a hooded sweatshirt and flashing gang signs with his hands.

b.   Based on conversations with Los Angeles Police Department Officer Chad Scott, who has had multiple prior contacts with POWELL and the Rollin 30's, the profile picture associated with SUBJECT ACCOUNT 1 depicts POWELL.   Specifically, Officer Scott, who is is assigned to the Southwest Division Gang Unit, and whose primary assignment is to monitor and investigate the criminal activities committed by the Rollin 30s, is well-acquainted with POWELL's appearance, associates, and social media accounts.   Based on his experience with POWELL and the Rollin 30's, Officer Scott believes that SUBJECT ACCOUNT 1's profile photograph depicts POWELL flashing gang signs with his hands.

c.   I further believe that SUBJECT ACCOUNT belongs to POWELL based on his known membership in the Rollin 30's Harlem Crips and the reference in the screenname associated with SUBJECT ACCOUNT 1 to "Harlem."

---

[4] OriginalHarlemBkoy is the Instagram account name. "ohbkoy5k" and "ohbkoy5" are the usernames, or sub-accounts that are associated with the account name and correspond to SUBJECT ACCOUNTS 1 and 2.   There can be multiple usernames associated with one account name.

e.   SUBJECT ACCOUNT 2 has a publicly available profile page and Instagram account name of "OriginalHarlemBkoy." Based on my review of the publicly available profile photograph on SUBJECT ACCOUNT 2, the profile photograph depicts an individual I believe to be POWELL sitting inside a vehicle. Furthermore, SUBJECT ACCOUNT 2 has several publicly accessible posts, which depict an individual I believe to be POWELL.  In addition, SUBJECT ACCOUNT 2 has publicly accessible videos clips, many of which are selfie style videos of POWELL.  Many of these videos include footage of POWELL in possession of firearms, prescription medication, flashing multiple one hundred dollar bills, and close up shots of high-value watches.

**E.   Probable Cause that the SUBJECT ACCOUNTS are Likely to Contain Relevant Evidence**

14.  Based on my training and experience, conversations with other law enforcement agents and officers, as well as my personal familiarity with this investigation, I am aware of the following:

a.   The SUBJECT ACCOUNTS are likely to contain evidence of discussions regarding the March 4, 2021 robbery. Individuals frequently use Instagram accounts to communicate with one another.  The evidence sought through this warrant will help to confirm the common connections between and amongst POWELL and his co-conspirators.  Indeed, based on my familiarity with robbery investigations, I am aware of the following as it relates to the use of social media such as Instagram:

        i.      Individuals who engage in robberies may use social media platforms to plan, prepare, and coordinate robberies using various features of those platforms, including, but not limited to direct messaging.  In doing so, these individuals may send messages discussing the firearm or firearms to be used during a robbery, items of clothing to be worn during the robbery, and the type of vehicles that may be used during the robbery.

        ii.     Individuals who engage in robberies may utilize social media to share photographs of vehicles they use in robberies.  Individuals who engage in robberies may also use social media to post or send photographs of the proceeds of their robberies, including large sums of cash and expensive purchases they may have made with robberies.

        b.   Moreover, the SUBJECT ACCOUNTS may contain evidence of POWELL's other associations and contacts, which may reveal their relationships with co-conspirators, known and unknown.  Such contacts and associations are frequently revealed through an individual's "friends" list or direct messages sent through Instagram and Facebook.

        c.   Based on my training and experience, individuals involved in criminal conduct also frequently post photographs of themselves with currency.  Such photographs here, around the time of the robbery, would help prove POWELL's involvement in the robbery and reveal the identity of the co-conspirators he worked with to commit the robbery.

       d.    The SUBJECT ACCOUNTS are likely to contain evidence of POWELL's and additional co-conspirators' whereabouts during the entirety of the conspiracy.  Such information can be obtained through geotagged photographs, photographs that depict visible landmarks, messages and communications regarding plans or meeting locations, or IP addresses used at specific times.

       e.    The SUBJECT ACCOUNTS are likely to reveal POWELL's phone numbers, either as verified phone numbers for the SUBJECT ACCOUNTS or as numbers POWELL provided to others through the SUBJECT ACCOUNTS.  Such phones can be useful to further track POWELL's movements and contacts.

15.  Based on my training and experience, I am aware that Instagram and Facebook accounts frequently contain evidence of phone numbers associated with their users.  Thus, the SUBJECT ACCOUNTS are likely to contain evidence of phone numbers used by POWELL and his co-conspirators.  This includes the verified phone numbers for the SUBJECT ACCOUNTS and other phone numbers, for example, that POWELL may have provided via messages through Facebook.

16.  Based on my conversations with Officer Scott of, who has had prior contacts with POWELL and the Rollin 30's, I understand the following:

       a.    The type of robbery committed on March 4, 2021, at Il Pastaio is consistent with the type of criminal conduct the Rollin 30's has recently been engaged in.  These robberies are often committed by a crew of co-conspirators who often use a scout on foot to search for victims wearing high-value watches.

These scouts will communicate the victim(s)' whereabouts and guide the robbery crew to their location. The robbery crew, often in cars that will later serve as getaway cars, descend upon the victim(s) and violently steal the victim's property. Firearms are often brandished, and sometimes fired, during these robberies.

### F.   BACKGROUND ON E-MAIL, SOCIAL MEDIA ACCOUNTS, AND THE PROVIDER

17.   In my training and experience, I have learned that providers of e-mail and/or social media services offer a variety of online services to the public. Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNTS. Subscribers obtain an account by registering with the provider. During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail or social media account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other e-mail addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

18.   Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, e-mail or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNTS.

19.   A subscriber of the PROVIDER can also store with the PROVIDER files in addition to e-mails or other messages, such as address books, contact or buddy lists, calendar data, pictures or videos (other than ones attached to e-mails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

20.   In my training and experience, e-mail and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.   In addition, e-mail and social media providers often have records of the

Internet Protocol ("IP") address used to register the account
and the IP addresses associated with particular logins to the
account.  Because every device that connects to the Internet
must use an IP address, IP address information can help to
identify which computers or other devices were used to access
the SUBJECT ACCOUNTS.

     21.  In my training and experience, e-mail and social media
account users will sometimes communicate directly with the
service provider about issues relating to the account, such as
technical problems, billing inquiries, or complaints from other
users.  Providers of e-mails and social media services typically
retain records about such communications, including records of
contacts between the user and the provider's support services,
as well records of any actions taken by the provider or user as
a result of the communications.  In my training and experience,
such information may constitute evidence of the crimes under
investigation because the information can be used to identify
the user(s) of the SUBJECT ACCOUNTS.

     22.  I know from my training and experience that the
complete contents of an account may be important to establishing
the actual user who has dominion and control of that account at
a given time.  Accounts may be registered in false names or
screen names from anywhere in the world with little to no
verification by the service provider.  They may also be used by
multiple people.  Given the ease with which accounts may be
created under aliases, and the rarity with which law enforcement
has eyewitness testimony about a defendant's use of an account,

17

investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account.  Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was.  Often those pieces will come from a time period before the account was used in the criminal activity.  Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account.  Therefore, the contents of a given account, including the e-mail addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account.  For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNTS, I am requesting a warrant requiring the PROVIDER to turn over all information associated with the SUBJECT ACCOUNTS with the date restriction included in Attachment B for review by the search team.

23.  Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNTS.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

24.  I also know based on my training and experience that criminals discussing their criminal activity may use slang,

18

short forms (abbreviated words or phrases such as "lol" to
express "laugh out loud"), or codewords (which require entire
strings or series of conversations to determine their true
meaning) when discussing their crimes.  They can also discuss
aspects of the crime without specifically mentioning the crime
involved.  In the electronic world, it is even possible to use
pictures, images and emoticons (images used to express a concept
or idea such as a happy face inserted into the content of a
message or the manipulation and combination of keys on the
computer keyboard to convey an idea, such as the use of a colon
and parenthesis :) to convey a smile or agreement) to discuss
matters.  "Keyword searches" would not account for any of these
possibilities, so actual review of the contents of an account by
law enforcement personnel with information regarding the
identified criminal activity, subject to the search procedures
set forth in Attachment B, is necessary to find all relevant
evidence within the account.

25.  This application seeks a warrant to search all
responsive records and information under the control of the
PROVIDER, which is subject to the jurisdiction of this court,
regardless of where the PROVIDER has chosen to store such
information.

26.  As set forth in Attachment B, I am requesting a
warrant that permits the search team to keep the original
production from the PROVIDER, under seal, until the
investigation is completed and, if a case is brought, that case

is completed through disposition, trial, appeal, or collateral proceeding.

27.   I make that request because I believe it might be impossible for a provider to authenticate information taken from a SUBJECT ACCOUNT as its business record without the original production to examine.  Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case.  If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNTS.

28.   I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers.  For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted.  As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account.  Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

**G.    Services Provided and Data Retained by Instagram.**

29.    From my review of publicly available information
provided by Instagram about its service, including Instagram's
"Privacy Policy," I am aware of the following about Instagram
and about the information collected and retained by Instagram:

30.    Instagram owns and operates a free-access social-
networking website of the same name that can be accessed at
http://www.instagram.com.  Instagram allows its users to create
their own profile pages, which can include a short biography, a
photo of themselves, and other information.  Users can access
Instagram through the Instagram website or by using a special
electronic application ("app") created by the company that
allows users to access the service through a mobile device.

31.    Instagram permits users to post photos to their
profiles on Instagram and otherwise share photos with others on
Instagram, as well as certain other social-media services,
including Flickr, Facebook, and Twitter.  When posting or
sharing a photo on Instagram, a user can add to the photo: a
caption; various "tags" that can be used to search for the photo
(e.g., a user made add the tag #vw so that people interested in
Volkswagen vehicles can search for and find the photo); location
information; and other information.  A user can also apply a
variety of "filters" or other visual effects that modify the
look of the posted photos.  In addition, Instagram allows users
to make comments on posted photos and videos, including photos
and videos that the user posts or photos posted by other users
of Instagram.  Users can also "like" photos and videos, meaning

that they can express approval of a photo or video by using
Instagram's "like" feature.

32.    Upon creating an Instagram account, an Instagram
user must create a unique Instagram username and an account
password.  This information is collected and maintained by
Instagram.

33.   Instagram asks users to provide basic identity and
contact information upon registration and also allows users to
provide additional identity information for their user profile.
This information may include the user's full name, e-mail
addresses, and phone numbers, as well as potentially other
personal information provided directly by the user to Instagram.
Once an account is created, users may also adjust various
privacy and account settings for the account on Instagram.
Instagram collects and maintains this information.

34.   Instagram allows users to have "friends," which are
other individuals with whom the user can share information
without making the information public.  Friends on Instagram may
come from either contact lists maintained by the user, other
third-party social media websites and information, or searches
conducted by the user on Instagram profiles.  Instagram collects
and maintains this information.

35.   Instagram also allows users to "follow" another user,
which means that they receive updates about posts made by the
other user.  Users may also "unfollow" users, that is, stop
following them or block the, which prevents the blocked user
from following that user.

36.  Instagram allows users to post and share various types of user content, including photos, videos, captions, comments, and other materials.  Such items can contain metadata, i.e., content about the data such as the date and tie the photo or video was taken.  Instagram collects and maintains user content that users post to Instagram or share through Instagram.

37.  Instagram users may send photos and videos to select individuals or groups via Instagram Direct.  Information sent via Instagram Direct does not appear in a user's feed, search history, or profile.

38.  Users on Instagram may also search Instagram for other users or particular types of photos or other content.

39.  For each user, Instagram also collects and retains information, called "log file" information, every time a user requests access to Instagram, whether through a web page or through an app.  Among the log file information that Instagram's servers automatically record is the particular web requests, any IP address associated with the request, type of browser used, any referring/exit web pages and associated URLs, pages viewed, dates and times of access, and other information.

40.  Instagram also collects and maintains "cookies," which are small text files containing a string of numbers that are placed on a user's computer or mobile device and that allows Instagram to collect information about how a user uses Instagram.  For example, Instagram uses cookies to help users navigate between pages efficiently, to remember preferences, and to ensure advertisements are relevant to a user's interests.

41.  Instagram also collects information on the particular
devices used to access Instagram.  In particular, Instagram may
record "device identifiers," which includes data files and other
information that may identify the particular electronic device
that was used to access Instagram.

42.  Instagram also collects other data associated with
user content.  For example, Instagram collects any "hashtags"
associated with user content (i.e., keywords used), "geotags"
that mark the location of a photo and which may include latitude
and longitude information, comments on photos, and other
information.

43. Instagram also may communicate with the user, by email
or otherwise.  Instagram collects and maintains copies of
communications between Instagram and the user.

44.  As explained herein, information stored in connection
with an Instagram account may provide crucial evidence of the
"who, what, why, when, where, and how" of the criminal conduct
under investigation, thus enabling the United States to
establish and prove each element or alternatively, to exclude
the innocent from further suspicion.  In my training and
experience, an Instagram user's account activity, IP log, stored
electronic communications, and other data retained by Instagram,
can indicate who has used or controlled the Instagram account.
This "user attribution" evidence is analogous to the search for
"indicia of occupancy" while executing a search warrant at a
residence.  For example, profile contact information, direct
messaging logs, shared photos and videos, and captions (and the

24

data associated with the foregoing, such as geo-location, date
and time) may be evidence of who used or controlled the
Instagram account at a relevant time.  Further, Instagram
account activity can show how and when the account was accessed
or used.  For example, as described herein, Instagram logs the
IP addresses from which users access their accounts along with
the time and date.  By determining the physical location
associated with the logged IP addresses, investigators can
understand the chronological and geographic context of the
account access and use relating to the crime under
investigation.  Such information allows investigators to
understand the geographic and chronological context of Instagram
access, use, and events relating to the crime under
investigation.  Additionally, Instagram builds geo-location into
some of its services.  Geo-location allows, for example, users
to "tag" their location in posts and Instagram "friends" to
locate each other.  This geographic and timeline information may
tend to either inculpate or exculpate the Instagram account
owner.  Lastly, Instagram account activity may provide relevant
insight into the Instagram account owner's state of mind as it
relates to the offense under investigation.  For example,
information on the Instagram account may indicate the owner's
motive and intent to commit a crime (e.g., information
indicating a plan to commit a crime), or consciousness of guilt
(e.g., deleting account information in an effort to conceal
evidence from law enforcement).

45.   Based on the information above, the computers of
Instagram are likely to contain all the material described above
with respect to the SUBJECT ACCOUNTS, including stored
electronic communications and information concerning subscribers
and their use of Instagram, such as account access information,
which would include information such as the IP addresses and
devices used to access the account, as well as other account
information that might be used to identify the actual user or
users of the account at particular times.

### H.   REQUEST FOR NON-DISCLOSURE

46.   Pursuant to 18 U.S.C. § 2705(b), I request that the
Court enter an order commanding the PROVIDER not to notify any
person, including the subscriber of the SUBJECT ACCOUNTS, of the
existence of the warrant until further order of the Court, until
written notice is provided by the United States Attorney's
Office that nondisclosure is no longer required, or until one
year from the date the requested warrant is signed by the
magistrate judge, or such later date as may be set by the Court
upon application for an extension by the United States.   There
is reason to believe that such notification will result in: the
destruction of or tampering with evidence or otherwise seriously
jeopardizing the investigation.   Although the current
investigation is public, law enforcement is working to identify
and charge additional suspects.   In addition, if the PROVIDER or
other person notifies the targets of the investigation that a
warrant has been issued for the SUBJECT ACCOUNTS, the defendants

and their co-conspirators might further mask their activity and seriously jeopardize the investigation.

### V.  CONCLUSION

47.  Based on the foregoing, I request that the Court issue the requested warrant.




Attested to by the applicant in
Accordance with the requirements
of Fed. R. Crim. P 4.1 by
telephone on this 15th day of
March, 2021.

_____
UNITED STATES MAGISTRATE JUDGE
 JEAN P. ROSENBLUTH

**ATTACHMENT A**

**PROPERTY TO BE SEARCHED**

This warrant applies to information associated with the Instagram accounts identified as: "ohbkoy5k" with user ID 30871860702 and Instagram name "OriginalHarlemBkoy" ("SUBJECT ACCOUNT 1"); and "ohbkoy5" with user ID 261180906 and Instagram name "OriginalHarlemBkoy" ("SUBJECT ACCOUNT 2"), a provider of electronic communication and remote computing services, headquartered at 1601 Willow Road, Menlo Park, California 94025, regardless of where such information is stored, held, or maintained.

## ATTACHMENT B

### ITEMS TO BE SEIZED

## I.  SEARCH PROCEDURES

1.    The warrant will be presented to personnel of Facebook (the "PROVIDER"), who will be directed to isolate the information described in Section II below.

2.    To minimize any disruption of service to third parties, the PROVIDER's employees and/or law enforcement personnel trained in the operation of computers will create an exact duplicate of the information described in Section II below.

3.    The PROVIDER's employees will provide in electronic form the exact duplicate of the information described in Section II below to the law enforcement personnel specified below in Section IV.

4.    With respect to contents of wire and electronic communications produced by the PROVIDER (hereafter, "content records," see Section II.11.a. below), law enforcement agents and/or individuals assisting law enforcement and acting at their direction (the "search team") will examine such content records pursuant to search procedures specifically designed to identify items to be seized under this warrant.  The search shall extract and seize only the specific items to be seized under this warrant (see Section III below).  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

5.     If the search team encounters immediately apparent
contraband or other evidence of a crime outside the scope of the
items to be seized, the team shall immediately discontinue its
search pending further order of the Court and shall make and
retain notes detailing how the contraband or other evidence of a
crime was encountered, including how it was immediately apparent
contraband or evidence of a crime.

6.     The search team will complete its search of the
content records as soon as is practicable but not to exceed 120
days from the date of receipt from the PROVIDER of the response
to this warrant.  The government will not search the content
records beyond this 120-day period without first obtaining an
extension of time order from the Court.

7.     Once the search team has completed its review of the
content records and created copies of the items seized pursuant
to the warrant, the original production from the PROVIDER will
be sealed -- and preserved by the search team for authenticity
and chain of custody purposes -- until further order of the
Court.  Thereafter, the search team will not access the data
from the sealed original production which fell outside the scope
of the items to be seized absent further order of the Court.

8.     This warrant authorizes a review of electronically
stored information, communications, other records and
information seized, copied or disclosed pursuant to this warrant
in order to locate evidence, fruits, and instrumentalities
described in this warrant.  The review of this electronic data
may be conducted by any government personnel assisting in the

investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized, copied, or disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

9.   The special procedures relating to digital data found in this warrant govern only the search of digital data pursuant to the authority conferred by this warrant and do not apply to any search of digital data pursuant to any other court order.

10.   Pursuant to 18 U.S.C. § 2703(g) the presence of an agent is not required for service or execution of this warrant.

## II. INFORMATION TO BE DISCLOSED BY THE PROVIDER

11.   To the extent that the information described in Attachment A is within the possession, custody, or control of the PROVIDER, regardless of whether such information is located within or outside of the United States, including any information that has been deleted but is still available to the PROVIDER, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the PROVIDER is required to disclose the following information to the government for each SUBJECT ACCOUNT listed in Attachment A:

12.   All contents of all wire and electronic communications associated with the SUBJECT ACCOUNTS, limited to that which occurred on or after January 1, 2019 to the present, including:

13.  All e-mails, communications, or messages of any kind associated with the SUBJECT ACCOUNTS, including stored or preserved copies of messages sent to and from the account, deleted messages, and messages maintained in trash or any other folders or tags or labels, as well as all header information associated with each e-mail or message, and any related documents or attachments.

14.  All records or other information stored by subscriber(s) of the SUBJECT ACCOUNTS, including address books, contact and buddy lists, calendar data, pictures, videos, notes, texts, links, user profiles, account settings, access logs, and files.

15.  All records pertaining to communications between the PROVIDER and any person regarding the SUBJECT ACCOUNTS, including contacts with support services and records of actions taken.

16.  All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes.

17.  All communications or other messages sent or received by the account, including via Instagram Direct.

18.  All user content created, uploaded, or shared by the account, including any comments made by the account on photographs, videos or other content.

19.  All photographs, videos, images, comments, captions, and hashtags, as well as any metadata associated therewith, in the user gallery for the account.

20.　All location data associated with the account, or with photographs, videos, or other content, including geotags.

21.　All records of Instagram searches performed by the account, including all past searches saved by the account.

22.　All information about connections between the account and third-party websites and applications.

23.　All other records and information, including:

24.　All subscriber information, including the date on which the account was created, the length of service, the IP address used to register the account, the subscriber's full name(s), screen name(s), any alternate names, other account names or e-mail addresses associated with the account, linked accounts, telephone numbers, physical addresses, and other identifying information regarding the subscriber, including any removed or changed names, email addresses, telephone numbers or physical addresses, the types of service utilized, account status, account settings, login IP addresses associated with session dates and times, as well as means and source of payment, including detailed billing records, and including any changes made to any subscriber information or services, including specifically changes made to secondary e-mail accounts, phone numbers, passwords, identity or address information, or types of services used, and including the dates on which such changes occurred, for the following accounts:

(I)　"ohbkoy5k" ("SUBJECT ACCOUNT 1"); and

(II)　"ohbkoy5" ("SUBJECT ACCOUNT 2")

(collectively, the "SUBJECT ACCOUNTS").

b.  All user connection logs and transactional information of all activity relating to each SUBJECT ACCOUNT described above in Section II.11.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

25.  All user connection logs and transactional information of all activity relating to the SUBJECT ACCOUNTS described above in Section II.10.a., including all log files, dates, times, durations, data transfer volumes, methods of connection, IP addresses, ports, routing information, dial-ups, and locations, and including specifically the specific product name or service to which the connection was made.

26.  A list of all the people that the user follows on Instagram and all people who are following the user (i.e., the user's "following" list and "followers" list), as well as any "friends" of the user.

27.  A list of all users that the account has "unfollowed" or blocked.

28.  All privacy and account settings, including past and present account status.

III. **INFORMATION TO BE SEIZED BY THE GOVERNMENT**

29.  For the SUBJECT ACCOUNTS listed in Attachment A, the search team may seize:

a.  All information described above in Section II.11.a. that constitutes evidence, contraband, fruits, or

instrumentalities of interference of commerce by robbery and
conspiracy to interfere with commerce by robbery, in violation
of 18 U.S.C. § 1951(a), and brandishing and discharging a
firearm in furtherance of a crime of violence, in violation of
18 U.S.C. § 924(c) namely:

        i.   Information relating to who created,
accessed, or used the SUBJECT ACCOUNTS, including records about
their identities and whereabouts.

        ii.  All search history and web history,
including web clicks or "History Events," by the users of the
SUBJECT ACCOUNTS;

        iii. Records, communications, images, and
information regarding any robbery, plan to commit robbery, or
conspiracy to commit the same;

        iv.  Records, communications, images, and
information regarding robbery;

        v.   Records, communications, images and
information regarding high-value watches, robbery targets, and
the scouting of robbery targets;

        vi.  Recordings, communications, images and
information regarding firearms;

        vii. Records, communications, images, and
information regarding any proceeds, expensive purchases, and/or
cash;

        viii.   Records, communications, and
information and regarding the user(s) whereabouts from November
1, 2019 to March 12, 2021;

        ix.  Records, communications, and information regarding any vehicles;

        x.  Records, communication, and information regarding any steps taken in furtherance of the scheme, transfers of cash, and the coordination to obtain vehicles.

    b.  All records and information described above in Section II.11.b.

## IV.  <u>PROVIDER PROCEDURES</u>

    30.  IT IS ORDERED that the PROVIDER shall deliver the information set forth in Section II within 10 days of the service of this warrant.  The PROVIDER shall send such information to:

    Special Agent Michael Fukuda
    11000 Wilshire Blvd, Suite 1700
    Los Angeles, California 90024
    mfukuda@fbi.gov

    31.  IT IS FURTHER ORDERED that the PROVIDER shall provide the name and contact information for all employees who conduct the search and produce the records responsive to this warrant. IT IS FURTHER ORDERED, pursuant to 18 U.S.C. § 2705(b), that the PROVIDER shall not notify any person, including the subscriber(s) of each account identified in Attachment A, of the existence of the warrant, until further order of the Court, until written notice is provided by the United States Attorney's Office that nondisclosure is no longer required, or until one year from the date this warrant is signed by the magistrate judge or such later date as may be set by the Court upon application for an extension by the United States.  Upon

expiration of this order, at least ten business days prior to
disclosing the existence of the warrant, the PROVIDER shall
notify the agent identified above of its intent to so notify.